Smith, J.
First — The first error assigned in this case is, “ that the trial ■court permitted the jury to visit the place where it is alleged the crime was committed, the prosecuting attorney and a son of the deceased being present with, and accompanying the jury, the defendant and his counsel not being present at such view.”
The journal entry recites, that after the jury were sworn, on the motion of the prose.cuting attorney, and in the opinion *436 of the court it being proper that the jury should have a view of the premises in which it is alleged the homicide occurred,, disordered that said jury be conducted in a body, under the charge of the sheriff, and that the defendant, if he desired, be allowed to go with said jury to the said premises, and that the same be shown to them by the sheriff, and that they return again immediately after viewing the said premises, which was accordingly done. To all which the defendant, by his counsel, excepts, as to the jury viewing the premises.”
The bill of exceptions afterwards taken, shows the same facts, and the order of the court that the'defendant be allowed to accompany the jury, if he desired to do so; and, in addition, shows that the jury in charge of the sheriff did view the premises, and that the defendant on the advice of his counsel declined to accompany the jury to make such view, and his-exception thereto. It further appears from the bill that on the return of the jury, the counsel for the defendant stated that he desired to offer proof to the court that there were present with the jury not only the prosecuting attorney, but a son of the deceased. No such evidence, however, appears to have been offered. The bill, however, says that the trial judge then remarked, “ that if it becomes necessary to make'up a bill of exceptions, it will there appear that no communication in words was uttered by any of these parties in the presence of the jury, and they took no part in the proceeding if present.”' And again the defendant excepted.
There being nothing whatever in the record to show that-any person, other than the sheriff and the twelve jurors, were present at this view, or that a single word was spoken by any one of them while viewing the premises, the question presented is, whether the action of the court in permitting it, in the absence of the defendant, he having full opportunity to be present if he chose so to do, but refusing to avail bimself of the privilege, is such error as will require a reversal of the judgment.
Sec. 7283 Rev. Stats, expressly authorizes the court to order-such view in criminal cases, when, in the opinion of the court,, it is proper that it should be done. It was held by the Circuit Court of the Third Circuit, in theicase of Hoteling v. The State *437 (3 C. C. Rep. p. 430), and correctly, we think, that it was the right of the defendant to be present at such view, and that if made while he is confined in jail, and thus prevented from being present (as in that case), that the action of the court was erroneous, and, for this reason, that the judgment should be reversed. But, as we understand the case, it does not decide, that if the accused had the privilege of being present, but refused to do so, that the proceeding would be erroneous.
We see no reason to question the power of the legislature to pass such a law. It is only putting into the form of a statute, the practice at common law, and does not infringe upon the constitutional provision, that “ in any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel,” and “ to meet the witnesses face to face,” or any other with which we are familiar. Of course, the court trying the accused, in the application of this statute, as in other cases, must see that his rights are not impaired, and if a view is ordered, care should be taken that he be present, or at least have an opportunity to be there. To this end, we doubt not, the court would have full power to require the sheriff to convey the defendant to the place in question, even against his wish; for it can not be conceded that the accused person, by declining to avail himself of the privilege of being present, should have power to prevent, or make it illegal, and thus render the statute entirely nugatory and of no value.
But as this course was not adopted, and the defendant was not in fact present at the view, did this make the proceeding erroneous ?
In the absence of authority in this state on the exact question, resort must be had to reason and principle. The suggestion is made in the Hoteling case, that if the view of the premises was a part of the trial, that it is certain that the defendant in that case should have been present when it was made; for sec. 7301 provides that in all cases of felony, no person shall be tried unless he be personally present. But it will be noted that the same section provides further, that if after the jury is sworn, the defendant forfeits his recognizance, or escapes, the trial shall proceed. And the court in-the case referred to, intimate strongly that the facts which *438 come to the knowledge of the jury by the view, and by the statements of those having the jury in charge, are in the nature of evidence, and make what takes place a part of the trial. We do not know that we would be disposed to go quite so far as this. The view is certainly a step in the trial óf a case, often valuable and necessary to enable the jurv to apply the evidence taken in the trial before the court and perhaps ought not of itself to be considered as evidence. But if it be conceded that it is, the question still remains, whether when the defendant has voluntarily declined to be present, he can properly claim that the action of the court granting it, was erroneous. If he voluntarily absents himself after the jury is sworn, nevertheless, the trial may proceed, as is explicitly provided for in sec. 7301. Or being by law, (as valid and binding as if enacted into a statute), entitled to be present at the rendition of a verdict in his case, he voluntarily remains away, he may not complain that the verdict was rendered in his absence, as is explicitly held in two cases in this state. 7 Ohio pt. 1; 181 and 2 Ohio St. 319. In like manner, and for the same reason, should not his refusal to be present at a view when he has the opportunity to be there, be a waiver, and operate to prevent him from claiming that there was error in having the view, without his presence? We think it would. As said by Judge Hitchcock in deciding the case of Rose v. The State, 20 Ohio, 33, and speaking for the whole court: “We conceive it to be the right of an accused person to be present during the trial of his case and at the return of the verdict, and we think that when deprived of these privileges by being imprisoned in a jail, or in any other improper manner, the verdict returned against him, should not be followed by judgment or sentence of the court, but a new trial should be ordered if requested. These rights may be waived by the accused person if he think proper, etc.” In our opinion, there was such a waiver in this case. That the defendant may waive his right to be present, see also, 5 Neb. 35.
Second — At the conclusion of the general charge given by the court to the jury, the defendant excepted to the same as a whole, without in any manner pointing out any particular *439 language or statement to which he objected. He then, by his •counsel, asked the court to give to the jury eight several special charges, seven of which were given in hasc verba, and •one only refused. It is sufficient for us to say, that if there was, as claimed by counsel for the defendant, any thing obscure in this general charge, or that it was not sufficiently •definite or applicable to the facts shown in the case, (which on account of the character of the exception taken to it, and on -clear and well founded principles we are not called upon to decide,) the charges requested by the counsel for the defendant and given by the court to the jury, were certainly most explicit on the same points, and it can not be said that the statement of law therein made, was unfavorable to the defendant.
Third — Did the court err in refusing to give special charge .No. 3 asked for),by the defendant? No. 2, which was given was in these words : “ If the jury have any reasonable doubt ■as to whether the killing was done with deliberate and premeditated malice, they can not find him guilty of murder in the first degree under the first count, no matter how cruel or wicked his actions may have been after the killing; or if the jury have any reasonable doubt as to whether the killing was intentional for the purpose of robbery, no subsequent bad behavior on the defendant’s part will justify them in finding him guilty of murder in the first degree under the second count.”
While the third, which was refused, was in these words: ■“ No matter how heartless or atrocious the conduct and language of the defendant may have been after the killing, the jury are bound to^look only to what occurred before, or at the time of the killing, in deciding as to the guilt, or degree of guilt, of the defendant.” The court assigned as a reason for the refusal of this charge, that it was given in the second charge above.
• As to this, we think the trial judge was mistaken. The proposition embraced in it, is very different from that announced in No. 2. But in our judgment, the charge as asked to be given was not good law, and for this reason ought not to have been given, and, consequently, there was no error in re *440 fusing it. If we at all understand it, if given by the court to the jury, it would have instructed them, that in determining the two questions of the guilt of the defendant, and the degree of that guilt, that they must not look at any fact or circumstance disclosed in evidence, which occurred after the killing of the deceased, no matter how shortly thereafter, but must determine these questions on the evidence as to what occurred prior thereto. That is, that the conduct of the defendant after the homicide, in taking from the person of his victim the watch and the money, and converting them to his own use ; the disposition made by him of the body ; the false statements shown to have been made by him, and his flight before he was accused, were not to be taken into account, or considered by the jury, for any purpose. Manifestly this was altogether wrong. Evidence as to all those matters had been properly admitted, and without objection, with the view of throwing light upon these vital questions in the case, and was of potent significance for that purpose, and entitled to the most careful and conscientious consideration by the jury, in their determination of them.
Fourth. The last question for our consideration is this: Was the verdict so manifestly against the weight of the evidence, as to require us to reverse it on that ground?
The defendant admits that he killed Col. Jones, at the time and place, and with the instrument described in the indictment, and the jury having found him guilty under the second count therein, which charged that it was purposely and maliciously done, and while the defendant was attempting to perpetrate a robbery, and take from the person of the deceased, money and personal property belonging to him, the two questions which remained were, whether the killing was purposely and maliciously done, and, if so, while the defendant was attempting to commit a robbery as charged. If they were shown, with the certainty required by law, then the finding of the jury was certainly right.
As stated, the defendant has admitted the killing, and that it was done by an instrument, which, when used by both of the hands of a muscular man upon the head of another (as is further conceded to have been the fact here), was calculated *441 to, and almost necessarily would produce death. This was also shown by the result of the blow itself, for the skull of the deceased was literally crushed in, and badly fractured, and, according to the statement of the defendant, he died almost instantly. On the well settled principles of the law that a person may well be presumed to have intended the usual, natural and almost necessary result of his own act, we think that it can not rightly be said that the jury in this case was not warranted in finding that the defendant intended when he struck the blow, to kill Col. Jones, even in the face of his evidence that he did not intend this result; and if the jury found, as they must have done, that the killing was wrongful and illegal, and not the result of a hasty quarrel between the parties, but was accompanied by other cruel conduct on the part of the defendant, or was done for the purpose of robbery, they were entirely justified in finding that the killing was malicious.
• The most difficult and troublesome question still remains, viz: Did the evidence sufficiently show, that the homicide was committed while the defendant was attempting to perpetrate a robbery, as charged in the indictment ?
It must be conceded that the testimony of Blythe himself, supplemented by statements shown to have been made by him, soon after his arrest, is the only direct evidence which was before the jury, as to what took place at the time of the homicide, or the circumstances under which it was done. There was nothing whatever to show that prior to this time any ill feeling existed between the parties, or that there had ever been the slightest trouble between them. The defendant for two or three months preceding this occurrence, had been in the employ of the deceased, working about his house and yard, and caring for his horses. Nothing was disclosed tending to show that the act had been premeditated or prepared for by the defendant. The-last that was seen of Col. Jones, in life, by any person other than the defendant, so far as the evidence shows, was by his son, who saw him asleep on a lounge in his house about half past two o’clock of the afternoon of July 26, 1889. How he came to his death is dis *442 closed only by the evidence of the defendant himself, and from admissions made by him after his arrest.
His evidence as a witness on his own behalf is substantially this: That under the direction of Col. Jones he had been engaged that afternoon, in cutting down or pulling up the tall weeds which were growing in the yard near the stable, which was situate about 120 feet west of the house and office of the deceased on the same lot. That he had suspended his work, and gone into the stable for a mere temporary purpose, and turned to go out again, and had reached a narrow passage leading to the stable door, when in the door of the buggy shed, situate north of the stable, and which door was the entrance way thereto, he saw the deceased standing. It is difficult to know from the statements of the witness, whether Col. Jones had the club in his hands when he first saw him, or whether he picked it up afterwards. He states the matter in both ways. He says that the deceased then asked him if he was in the garden pulling weeds, as he had told him. That he replied to him that he was on his way back to the garden to do so. That Col. Jones said, “ I told you two or three times to pull the weeds out of the garden. Damn it, I don’t want to tell you any more about it.” That he then started to step out of the stable door, and the Colonel picked up oneof several sticks or clubs lying on the floor, and without saying anything further, struck the defendant with it on his right shoulder, as he was turned away from him. That the defendant then stooped and picked up another stick (which had been used for baling hay), and holding it with both hands, struck the deceased, who was standing with his side or back towards him, on his head, and that he at once fell to the floor, groaned once or twice, but did not speak or move.
That he remained there watching him, (sitting in the door of the stable), for fifteen or twenty minutes, when he saw Dr. Jones, the son of the deceased, coming through the yard to- ■ ward the stable. That he went to meet him, and inquired if he had brought the horse back, and on his answering that he had, that he went to the front of the office, got the horse, and brought it to the stable, having left the body of Col. Jones lying on the floor. That he then took a sack which belonged *443 in the stable, and forced the body into it, and fastened the mouth of the sack with a strap, and placed it in one of -the stalls and went on to perform his ordinary work about the house, • taking part that evening and the next day in the search for Col. Jones, and as the other evidence shows, with perfect coolness, and apparent ignorance of what had become of him. He further testified that while he was putting the body into the sack, the watch of the deceased and a silver dollar fell from his pockets, and that he at once took possession of them, hiding the watch in the stable until about six or seven o’clock that evening, when he took it to the city and pawned it for $10.00, having tripd to sell it to the pawnbroker for $15.00. That he then came back to the stable, and between ten and eleven o’clock at night took the sack on his shoulder,, and came out of the stable by the east door, and by the gate east of the stable went out upon Cemetery street, which he crossed diagonally to the south side, and went from thence to Park avenue, and down that street to the manhole of the sewer, into which he threw the body. Thathe was at the house nearly the whole of the next day and assisting in the search,, and during that morning, as he says, about ten or eleven o’clock, his attention was called by some laborers to drops of blood on the south side of Cemetery street, there being none on the north side. He denied taking the body out on the west side of the stable, saying that there was no way in which he could have done so. Pie further testified that at the time he struck the blow, he had no intention of killing Col. Jones, and had no thought or purpose of robbing him, and that the reason why he did not inform some one of what he had done,, was, that he was frightened, had no friends here, and did not know what to do.
He further testified that at the time of the homicide he had' only fifty or sixty cents; that he had contracted for the renting ,of a house for his wife and himself (she having lately come to him from Kentucky), and had agreed to pay one month’s rent ($7.00) in advance, and the payment was to be made just at that time; and that on Friday evening, with $5.00 received on the watch, and $1.00 taken from the body,, he paid $6.00 thereon ; that he came back to the house early *444 on Saturday morning, but becoming fearful that he was suspected, he fled, but was arrested at Madisonville, when he confessed that he had killed Col. Jones. In answer to a question from his counsel, he said that he had told the whole story then, as he had told it on the witness stand, except that he had denied taking the watch. No further inquiry was made of him as to what he did say when he was arrested, by either side, and no proof was offered by either as to what statements were in fact made by him at that time.
Now, this is, in substance, the testimony given by the defendant, and if it be true, it is clear that the jury should not have found him guilty of a greater offense than manslaughter, for in such case the purpose to kill or to rob would not have existed, or have been shown. But were his statements as to these two matters true, or, rather, was there evidence which justified the jury in refusing to credit them, and in finding that these two essential elements of the crime of murder in first degree, as charged in the second count, were present ?
In our opinion there are certainly facts and circumstances disclosed which tend very strongly to show that all the statements made by the defendant as a witness are not entitled to equal credence. In the case of Schneider v. The State, (2 C. C. Rep. 420) we had occasion to consider the question which arises here, viz: how far, and to what extent, courts and juries are bound to give credit to the statements or confessions of an accused person, some of which are criminating and others exculpatory of himseif, and our conclusions were these, that “while it is the law, when the confessions or admissions of a defendant in a criminal case are offered in evidence against him, that ató that he said at the same time, should be taken and considered by the jury and have its just weight, it does not follow that all of it is entitled to equal credit. For good reasons, one part of it may be received as true, and another part rejected as false. And where it appears that the body of the crime is clearly shown by other evidence, and it also appears therefrom that the defendant was the last person seen in the company of the deceased, and under suspicious circumstances, and 'afterwards admits that he was present when the deceased (his mother), was killed, *445 robbed and buried, but alleges that it was done by other persons, and the story told by him, in some points inculpating him, is strongly corroborated by circumstances, and in those statements exculpating him is wholly improbable and unnatural ; and the evidence further shows that he concealed the fact of her death for several weeks, and other circumstances of suspicion are shown against him, the jury might well believe his confession so far as it tended to show his guilt, and disbelieve his statements in his own favor.”
Does thÍ3 case fairly come within this doctrine of the law ? In the first place it may be said, that the statements of this defendant should be very closely scrutinized for several reasons. He was vitally interested in the result of the case in which he gave his testimony — if guilty of the principal crime charged against him, his life would be forfeited if he testified truly, and in such case the temptation to falsehood as to these two .matters was exceedingly great. On his own statements his moral character was.such as to entitle his evidence to but little weight. Aside from the fact that he killed his employer,, an old man, 70 years of age (which might have been the result of sudden passion, and not from a bad heart), the taking of the property from the person of the deceased, whom he had just killed, and converting it to his own use, and the subsequent exhibition of himself as a hardened and depraved man would justly lead to the belief that he would not hesitate-on any moral ground, to testify to just such facts as he thought it would be to his advantage to testify to.
In addition to this, some of the statements so made by him do not seem very probable, and as to others he is contradicted. His account of the conflict itself, does not seem very reasonable or natural. As has been said, there was no proof of any previous ill will on the part of Col. Jones, or that he was of a violent character. The only testimony on this point was to-the effect that he was not. The defendant claims that he had only left bis work for a moment, and was returning to it when attacked in the violent and unprovoked manner described by him, and this, too, when, if his story that he had been engaged in pulling up the weeds, was true, Col. Jones must have seen it. On the defendant’s statement, there seems "to have been *446 no apparent reason for the conduct of the deceased, or why he ■should have become so enraged as to make this violent assault upon his servant.
The defendant is in effect contradicted by Dr. Jones as to what took place about 5 o’clock, when he returned home. The former says that the son came through the yard towards the stable, and that he met him and went to get the horse, leaving the body lying on the floor where it had fallen' — a strange ¡thing to do, if he was intending to conceal the crime, as he •evidently was. But the doctor says that when he returned he hitched his horse in front of the office, and the defendant came out and took it, and that they had no conversation that he recalls, as stated by defendant.
There is conflict too between the defendant and Dr. Jones as to the place where the first traces of blood started. The ■defendant ,says, though strictly and closely questioned as to this, that none were found on the north side of Cemetery street near the stable; but Dr. Jones says, that on Friday the defendant took him out to the stable, and showed him the trail of blood, which began at an opening in the fence west of the stable, and as we gather in a vacant lot west of it on which was a heavy growth of tall weeds, and at a point wholly different from that fixed by the defendant in his evidence, and which, if correct, would seem to show that the body was carried, until the bearer reached Cemetery street, by a wholly different route than that stated by him; and this leads to the query, whether the evidence of the defendant, as to the place where the killing was done, and the circumstances under which it was done, and where the body was hidden, are at all to be depended upon, particularly in view of the fact that on Thursday evening, about ten o’clock, the stable was examined and no traces of.a scuffle, or of the body or any blood was found.
We will refer to one other matter in this connection. Mr. Hazen, a witness for the state, testified that on Sunday morning, after the arrest df the defendant, he had a conversation with him, and said, “ I understand you have told all about the murder case.” “ He then asked him about the watch. “He first denied having the watch, or knowing anything *447 about it.” Afterwards however he told all about it, what he had done with it, and where he had pawned it, and it was recovered. “ I then asked him what the trouble was between him and the doctor” (Col. Jones). “Well,” he said, “there wasn’t much of anything. The doctor had cursed him and hit him with a club.”
Question by Prosecuting Attorney: “That is. you mean that the defendant had hit the doctor with a club ? ” Answer— “•Yes, this man.” This was the whole of the testimony of the witness on this point, and it is not at all clear from it, whether the witness testified that defendant said that Col. Jones had struck him with a club, or that he had struck the Colonel. If the first, then it agrees with the evidence of the defendant; if it was the other, the fact that in his first statement he did not claim that he was struck with the club, would be a strong circumstance against him. Which supposition is the correct one, we do not know.
. On this state of fact, then, what was the jury authorized to find, as to the intent to kill, and to rob ? The killing itself was admitted, and clearly shown. The purpose to kill was sufficiently established by the use on a vital part of an old man, not then confronting him, of a deadly weapon, wielded by both the hands of the defendant, resulting in instant death, unless the jury gave credit to the statement of the defendant that he did not intend it, which we think they were not bound to do. The only point of difficulty is, whether it is shown that it was done while he was attempting to commit a robbery. The defendant admits, after strenuously denying it, that he did take the property after killing the old man, and did appropriate it*to his own use. Would he have done this if the homicide were the result of a sudden quarrel? Would he not rather have made known what he had done, and bear the consequences ? But there is a strong presumption that a person intended to do that which he afterwards voluntarily does, unless the facts and circumstances disclosed lead to a different conclusion. And when it appeared to this jury, that the defendant was in a strait for money, and thus had a strong motive for the act, and had knowlege, as'he says he had, that the deceased was likely to have money to supply *448 his need, and it clearly appeared that under these circumstances he actually killed his employer, and took from his person of all his valuable property, and appropriated it to his own use, and concealed the crime as he was best able to do, wbo can say that the finding of the jury, that he killed while attempting to rob him, was clearly wrong, even in the face of the denial of the fact by the defendant? To allow the simple and unsupported statement of the accused (on his own evidence a man of criminal instincts and practices, vitally interested in the case, and with strong temptation to falsehood), such statements, as has been said, being improbable in some particulars, aud contradicted in others by disinterested witnesses, to outweigh the other evidence in the case, and the strong presumptions which naturally and legitimately arise therefrom, would be dangerous.
In the full, and very anxious examination which we have made of this branch of the case, we have- not failed to consider, and, as we trust, to give just weight to the fact and the strong argument founded thereon, that there is nothing whatever in the evidence to indicate that this homicide had been premeditated or arranged for by the defendant; that it occurred in the most populous suburb of a large city, and not far from the most thickly settled part of it; and that it occurred at an hour of the day (say half-past three in the afternoon) when such an act could hardly be expected to be concealed, or a man be likely to be robbed and murdered. This is all true, and yet it must be said, so far as the place is concerned, that it was comparatively a retired spot. The stable where it is said to have been committed, fronts on Cemetery street, hardly more than a lane, twenty or twenty-five feet wide, and evidently not much of a thoroughfare. The house nearest by far to the stable, (as shown, by a view of the premises) is that of the deceased, distant, say,T20 feet, and separated therefrom by a high picket fence, while to the west of the stable was this large vacant lot covered with a growth of tall weeds. And as to the improbability that a murder should then, and under such circumstances, be committed for the purpose-of robbery, we are forced to find, from the statement of the defendant himself, that at that very time and place, he did kill the deceased, and did take his property.
Robt. Q. Pugh, for plaintiff in error.
John O. Schwartz, for the state.
We have no hesitation in saying that we would affirm this judgment with much less hesitation, if these two essentials of purpose to kill and intent to rob had been more clearly shown, where the life of a human being is at stake. But the court is bound to administer the law as it stands. If it were in our power to do so, in view of the doubt which one can not help feeling where so much is involved, we would be inclined in view of all the circumstances, to say that the safest course would be to commute the sentence to that of imprisonment for life. But we. have no such power. All we are called upon to do is to say, whether or not the verdict of the jury is so clearly and manifestly against the weight of the evidence, that it should be reversed. They had all the witnesses before them — thej’ saw the scene of the homicide— they heard the full statement of the defendant himself, and were much better qualified then we to judge as to his credibility and the truthfulness of his several statements. They have said he was guilty as charged in the second count of the indictment, and the trial judge refused to set aside this verdict, and we are unable to say that his decision is clearly W'rong. The judgment will therefore be affirmed.